UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

_____

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. 05-50040 |
| versus | JUDGE WALTER |
| REGINALD G. DAVIS | MAGISTRATE JUDGE HORNSBY |

_____

## REPORT AND RECOMMENDATION

**Introduction**

Defendant has filed a Motion to Suppress (Doc. 15) contending that his confession was not given voluntarily. More specifically, Defendant argues that express promises of leniency were made to him; that his requests to cease questioning were ignored; and that, under the totality of the circumstances, the incriminating statements made by Defendant were not the product of his free and rational choice. Once a transcript of the interrogation was prepared, Defendant filed a Supplemental Memorandum In Support of Motion to Suppress (Doc. 28), and the Government filed its Response (Doc. 29).[1]

---

[1] All counsel agreed that an evidentiary hearing was not necessary to resolve Defendant's motion, because all relevant facts are set forth in the transcript of Defendant's interrogation. Therefore, no evidentiary hearing has been held.

On September 7, 2005, the undersigned ordered the parties to submit supplemental briefs on the issues of (a) whether the officers threatened or suggested to Defendant that his exercise of the right to remain silent could result in harsher treatment by the court or the prosecutor; and, if so, (b) what effect the threats or suggestions had on the voluntariness of Defendant's statements under the totality of the circumstances. Doc. 31. The undersigned asked the parties to discuss any relevant Supreme Court or Fifth Circuit cases, but, in the absence of cases dealing with the particular issues before the court, the parties were invited to submit non-binding authority to the court "for whatever guidance, if any, it may offer." The court also cited counsel to five such non-binding decisions. Id.

The Government filed its supplemental brief on September 7, 2005. Doc. 32. The Government stated that it had done extensive research on the issue and had not found a case directly on point issued by the Fifth Circuit or any other federal court. Despite the invitation to discuss the non-binding decisions cited in the court's prior order, the Government elected not to do so.

Defendant filed his supplemental brief on September 14, 2005. Doc. 33. Defendant argues that the threats used by the officers amounted to a *quid pro quo*: cooperate and receive less severe punishment or continue to be difficult and receive harsher punishment. After discussing the non-binding decisions cited by the court, Defendant concludes that the officers' threats created an unacceptably coercive environment which put Defendant in the untenable position of confessing and receiving promised leniency or exercising his

constitutional rights and being treated more severely. Defendant's Second Supplemental Brief, p. 5. Defendant, like the Government, cites no additional legal authority.

Having again reviewed the transcript and the parties' briefs (and supplemental briefs) and having again listened to the audiotape of Defendant's interrogation, the undersigned finds that the officers interrogating Defendant impermissibly threatened Defendant that his exercise of his right to remain silent would result in harsher treatment by the court, the grand jury and the prosecutor. When those impermissible threats are considered along with Defendant's rather obvious reluctance to speak to the officers and the officer's numerous, express promises of leniency if Defendant would confess, the undersigned further finds that, under the totality of all of the circumstances, Defendant's incriminating statements were not voluntarily made and should be suppressed.

**The Charges**

Defendant is charged in a one count indictment with bank fraud, 18 U.S.C. § 1344. The indictment alleges that Defendant used a bank account number (assigned to a special account set up to benefit a law enforcement officer who had become stricken with a life-threatening disease) to cause $282.85 to be drawn from the account to make a payment on a Sprint cell phone account used by Defendant.

**The Interrogation**

The interrogation of Defendant was conducted by three law enforcement officers, one of whom is a special agent with the FBI. Immediately prior to the interview, Defendant

executed a document (on the letterhead of the Shreveport Police Department) entitled "MIRANDA RIGHTS." The form notified Defendant of his <u>Miranda</u> rights and advised Defendant that he may waive those rights. The form ends with this statement and question:

> WHILE YOU ARE NOT REQUIRED TO MAKE ANY STATEMENT, YOU MAY WAIVE THOSE RIGHTS JUST EXPLAINED TO YOU AND YOU ARE GIVEN THE PRIVILEGE OF SAYING ANYTHING YOU WANT TO ABOUT THIS CASE. NOW WITH THIS UNDERSTANDING AND WAIVING THOSE RIGHTS JUST EXPLAINED TO YOU, **DO YOU WISH TO MAKE A STATEMENT AND TELL HOW THIS HAPPENED**?

[Emphasis added.] Defendant signed the document, but nowhere on the document did he actually answer that question or otherwise indicate that he wished to make a statement. Instead, his signature simply follows that question on the form.

The transcript shows that Defendant voluntarily appeared for questioning at the Shreveport Police Department. Tr. 3. The transcript also shows that, when the interrogation began, an officer explained to Defendant that he was under investigation for his part in an identity theft. Defendant was orally notified of his <u>Miranda</u> rights, and then he was asked whether he wished "to make some statement [sic] tell how this happened?" The transcript, which was prepared by the Government, shows that Defendant's response was "(UI)" or unintelligible. Tr. 1.

The interrogation began, and Defendant was asked about his cell phone. Defendant denied knowing anything about a cell phone. Tr. 2. However, the police officers told Defendant he had an opportunity to help himself. Tr. 3. They also told him that, "in a little

while the FBI's going to show up," and "*the next time you see Shreveport will be after you get out of Fort Leavenworth Prison*." Tr. 3-4 [Emphasis added]. Defendant was told he needed to "fess up." Tr. 4.

When asked where he and his girlfriend reside, Defendant responded: "I mean I don't want to give out that information either." Tr. 5. In response, the officer stated:

> You don't have to talk to me okay. You signed the thing that says that you don't have to talk to me. ***But the least amount of talking you do means the most amount of charges I put on you***. I'm not sitting in here because I don't have evidence to put you in jail. Right now I have evidence to put you in jail. I don't have to talk to you. I can sit here and we can not have a conversation. *I'll wait until the FBI gets here and I'll let them hook you up and you're going to go away*. Okay. Now you can keep up the bull shit. I don't want to talk and I don't want to tell you about my girlfriend. I don't want to tell you where I've been staying. You can keep all that up and we'll end this conversation. I'll walk out that door." [Emphasis added.]

In response, Defendant immediately provided the address. When pressed again about the cell phone, Defendant stated: "Well, I mean that's all I can tell you." Tr. 10.

Once the FBI agent entered the room (the interrogation already had begun), the officers told Defendant: "See I tried to give you an opportunity to come clean" and "if you got an idea who is using that phone or if you had any knowledge of it you better tell us now, right now." Tr. 12. The officers also told Defendant: "I understand you're scared and all that and you don't want nothing to happen to you *but playing it this way is not going to happen*." Tr. 12 [Emphasis added].

The FBI agent then told Defendant about the charges he faces and how defendant can "head it off:"

> "We have 18 U.S.C. 1001 and [unintelligible] anything you say to me if it is a false statement... It's a five year felony.... What we look at is do we have enough evidence to go to a Grand Jury and get an indictment. I think we do....Let me tell you what's going to happen. Okay. I'm going to indict. Five year felony, false statement, five year felony, when you activated these phones and you stole money from those accounts. *Those are five year felonies*.... We'll charge each one of those [phone calls]... By phone usage. Each one is a five count felony... You're going to wind up with like a reasonable estimate at least 10 count, 10 count indictment... And then you know we'll present it to the jury based on information we have and you know 10 times 5. *50 years in the federal system* and you ain't going to get no good time like state time.... Now what we can do is head it off.... If you did it, we need to know..."

Tr. 19-20.

Defendant persisted in his answer that he did not know anything about a cell phone. In response, Defendant was warned:

> "Here's what's going to happen... I'm going to the Grand Jury, next available Grand Jury, if I have to go anywhere in the state to get an earlier Grand Jury *we will indict you.... We're going to throw the book at you.* It's going to be all over the media... Let you [sic] know if you did it, if you know who did it, you need to tell us.... Cause right now your picture [is] about to hit the newspaper anyway.... Because right now, I've got people that say you did it. Eyewitness people...But here's what we're going to do.... There's an easy way to do this... and there's a hard way. We're going to do it the hard way.... We'll see you in court."

Tr. 24-25. Then, the officers misrepresented the presumption of innocence to Defendant, telling him: *"You can try to convince 12 jurors that you had nothing to do with this* and we'll put on our witnesses and go from there." Tr. 24-25.

Defendant finally relented and admitted that "somebody did sell me a phone." Tr. 28. He also admitted that "Bubba" approached him about turning his [Bubba's] cell phone on. Tr. 29. However, Defendant denied helping Bubba turn on his phone, and Defendant stated that once he learned his phone was stolen, he got rid of it. Tr. 29-30. At that point, Defendant was threatened with another charge – failing to report a federal offense. Tr. 30.

Defendant then admitted he bought the cell phone from a "black guy." Tr. 31. However, Defendant stated that, after the police called his cell phone, he threw it away. Tr. 31. The FBI agent, however, again threatened an indictment (Tr. 31), and also threatened Defendant that he would be *held in pretrial detention without bond*. Tr. 32. Defendant was told: "We're going to charge you.... You picked the wrong person's account to mess with." Tr. 33. And, again, misstating the presumption of innocence, the FBI agent told Defendant: "It'll be up to you to convince the jury that you just bought a phone from a black guy on the street." Tr. 33. The agent also stated: "We [the federal agents] operate under a different set of codes, criminal codes, like I told you false statements. We charge it all the time. You make false statements [sic] you may have heard about it. Martha Stewart went to Club Fed and she got several months. It and ah she is a lot more powerful than you or I. You know this is your opportunity to tell the real truth." Tr. 33. Defendant then told the officers that the man who sold him the phone was "Melvin." Tr. 37.

Defendant then asked the officers what he was charged with. Their response: "Identity theft right now.... we're going to charge you for ah, wire fraud, the money being

transferred, ah about three counts of that I believe. Ah, charge you for the false statements you've made to [the FBI agent] today. Ah, based on well we'll use other witnesses to basically contradict what you said and leave it to the jury." Tr. 42-43. When Defendant asked whether the officers were "going to cut [him some] slack," one officer responded: "We'll cut you some slack if you'll explain to us what happened." Tr. 43. That officer then explained:

> But we can't, we actually, right now I'd like to cut you a lot of slack. But you understand *if you don't cooperate with us*, when I walk out this door and there is a captain standing there that says what did you charge him with? And I say well you know we took it easy on him. And he says why? And I need to be able to say well look captain this guy was honest with us. He came in on his own free will. He sat down and explained to us what happened and how it happened. And he fessed up to it. Actually [unintelligible] that's why we didn't charge him with everything we had. That's why we didn't prosecute every gun. You know, but if I can't go up to him and say that is there any reason for me to put my ass on the line for you? No, you know cause at the end of the day I'm going to answer to him tomorrow and the day after that. So if you don't give me anything to go out of here with you know then I don't have anything. So I can't help you, you can't help me. We're stuck. *The only way to take some slack and to take some charges off is just to be straight.*

The officers then told Defendant that his refusal to cooperate would lead to harsher treatment by the grand jury:

> People that are sitting on the Grand Jury are normal people. You know one of the biggest things that they like to see is people that come in there and say I screwed up and this is how it happened. And when you can tell your side of the story as to how it happened they can listen to it and go damn you know.... But when they have somebody sitting over there going I ain't had nothing to do with nothing. What do they identify with? *Oh he's going to be a hard ass. I'll show him a hard ass....* That's why we're giving you the opportunity.

Tr. 43-44. That statement also implied that Defendant was obligated to testify before the grand jury. In response, Defendant told the officers that he told Melvin that he (Defendant) had a phone that needed to be hooked up. Tr. 45. Defendant stated he got money from Bubba and paid it to Melvin (a/k/a Earl). Tr. 45, 50. However, Defendant denied taking funds from someone else's account. Tr. 48. The FBI agent then threatened Defendant again with making false statements: "I mean even, even if we just take one of your false statements here and charge you with that, you've admitted you lied. I mean that's a five year felony. Will that be enough to ah appease the people who are upset about this? I don't know." Tr. 50.

Defendant insisted that his only role in the office was that he bought a phone from Melvin and helped Bubba get his phone turned on. Tr. 54. Defendant continued to deny any further role in the offense, so the officers continued to press Defendant. Defendant responded: "*Sir, I done said all I had to say sir*." Tr. 54. However, Defendant then asked what he would be charged with, to which the FBI agent responded:

> You know if you're honest with me. This is ah, we'll make this as minor as possible. I personally don't know. I don't charge you. It's the United States Attorney's Office that charges you. If you tell me the truth, I'll go to him and tell him the truth. It's a $500 crime. But, I will tell you this, I personally think *it will be a lot more severe* if I go to the Grand Jury .... and get an indictment. It's going to be a multi-count indictment.... We put all that there, I think it's going a lot harder on you. If you tell us the truth, tell us who else was involved. How to go talk to him, I will tell him, I will tell the United States Attorney's Office, you cooperated. I mean we might, there is a lot we could charge you with. There might even be a misdemeanor we could charge you

with. I don't know. All I know is what we could do is say okay *which is the worst felony*? Tr. 55.

In response, Defendant admitted that "[i]t was me and Bubba doing it." Tr. 55. However, Defendant continued to deny accessing the bank account. Tr. 55. The officers continued to press Defendant for more information, stating that they would "go to bat" for him. Tr. 57. Defendant then admitted he was responsible for the phone. Tr. 57-58. He stated that Bubba gave Defendant the information, and Defendant "did it." Tr. 58. The interview ended when Defendant stated he did not want to talk further and needed a lawyer. Tr. 64.

**Applicable Law**

When a defendant challenges the voluntariness of a confession, the Government must prove its voluntariness by a preponderance of the evidence in order for the confession to be admissible as substantive evidence at the defendant's criminal trial. United States v. Garcia Abrego, 141 F.3d 142, 170 (5th Cir.1998). "A confession is voluntary if, under the totality of the circumstances, the statement is the product of the accused's free and rational choice." United States v. Bell, 367 F.3d 452, 460-462 (5th Cir. 2004); United States v. Broussard, 80 F.3d 1025, 1033 (5th Cir.1996). Voluntariness is evaluated based on the totality of the circumstances, including the characteristics of the accused and the details of the interrogation. Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973). Factors include the age of the accused, his intelligence and education, advice regarding his constitutional rights, length of detention, repeated and prolonged nature of the questioning and whether physical punishment

such as deprivation of food or sleep was imposed. Id; See also U.S. v. Barlow, 41 F.3d 935, 945 fn. 27 (5th Cir. 1994). No case turns on the presence or absence of a single factor. Id.

**Threats and Promises**

In Bram v. United States, 168 U.S. 532, 542-43 (1897), the Supreme Court stated that the test for determining the voluntariness of a confession is whether the confession was extracted by any sort of threats or violence, or obtained by any direct or implied promises, however slight, or by the exertion of any improper influence. See also Streetman v. Lynaugh, 812 F.2d 950, 957 (5th Cir. 1987). Although the Bram test has been reaffirmed in Hutto v. Ross, 429 U.S. 28, 30 (1976)(holding a confession is voluntary so long as the promise did not overbear defendant's will) and in Brady v. United States, 397 U.S. 742, 753-54 (1970), it has not been interpreted as a *per se* proscription against promises made during interrogation. Hawkins v. Lynaugh, 844 F.2d 1132, 1139-1141 (5th Cir.1988). Nor does the Supreme Court use a "but for" test when promises have been made during an interrogation, despite the seemingly plain meaning of the Bram rule. Rather, the Court has indicated that it does not matter that the accused confessed because of the promise, so long as the promise did not overbear his will. Hutto v. Ross, 429 U.S. at 30.

Despite the broad language in Bram, the cases indicate that government agents may validly make some representation to a defendant or may discuss cooperation without rendering the resulting confession involuntary. Miller v. Fenton, 796 F.2d 598, 608-613 (3rd Cir. 1986), cert. denied,, 479 U.S. 989 (1986). Government agents may initiate conversations

on cooperation, they may promise to make a defendant's cooperation known to the prosecutor, and they may even be able to make and breach certain promises without rendering a resulting confession involuntary. Id. The Government also may advise the defendant that it would be to his benefit to cooperate and tell the truth. United States v. Ruggles, 70 F.3d 262 (2nd Cir. 1995)(statement that it would be to defendant's benefit to cooperate was not coercive); United States v. Barfield, 507 F.2d 53 (5th Cir. 1975)(mere admonition to tell the truth does not render a confession involuntary).

Whether, and to what extent, it is acceptable to threaten a defendant during an interrogation are more difficult questions. Some threats have not been found to render a confession involuntary. United States v. McCotter, 804 F.2d 1362 (5th Cir. 1987)(threat to file charges against defendant's wife did not render defendant's confession involuntary when the officer had probable cause to arrest wife for aiding in robbery); United States v. Wyche, 307 F.Supp.2d 453, 464 (E.D. N.Y. 2004)(threat to charge a third party does not render defendant's confession inadmissible when the third party is plausibly guilty of the crime).

The threats in this case, however, are altogether different in number, kind and degree. The officers, under obvious pressure to solve the case quickly (Tr. 49-50), repeatedly threatened Defendant with harsher treatment by them, the court and the Grand Jury if he did not cooperate with them. They suggested to Defendant that if he did not cooperate before the FBI agent arrived, Defendant would be sent to a federal prison. Tr. 3-4. Defendant was told that if he did not talk to the officers, they would put more charges on him. Tr. 5-6. He

was told that the only way he could take some charges off of himself was to "be straight." Tr. 43. Defendant was warned that if the officers went to the grand jury, he would be treated more severely, Tr. 55, and the grand jury would treat him more harshly if he continued to deny his involvement. Tr. 44. He was told about the numerous felonies he could be charged with if he failed to cooperate. Tr. 19-20, 30, 42-43, 50. He was told it would be his obligation to explain his actions to the jury. Tr. 24-25, 33.

While the parties and the undersigned have found no Supreme Court or Fifth Circuit precedent addressing facts similar to those before this court, there are cases from other jurisdictions that bear discussing. In South Dakota v. Tuttle, 650 N.W.2d 20 (S.D. 2002), the South Dakota Supreme Court found that a confession was coerced when the defendant was told that the police would write in their report to the prosecutor that defendant was not cooperating and was being a "real jerk about it." According to the Court, the "unmistakeable message was, if Tuttle refused to confess, then the report to the authorities would be written to discourage any leniency, meaning Tuttle would likely suffer more severely for not confessing. This was coercive." Id. at 35. The Court found under the totality of the circumstances, including the implied threat of more serious consequences, that "the scale tilts toward holding the confession involuntary." Id. The Court concluded: "Police may legitimately tell a suspect that cooperation will be passed on to the authorities and may increase the likelihood of leniency, but threatening to inform the prosecutor or the judge of

a suspect's refusal to cooperate violates the Fifth Amendment right to remain silent." Id. at 36.

Similarly, in Mathews v. Alabama, 601 So.2d 52 (Ala. 1992), the Supreme Court of Alabama found that a suspect's confession was involuntary because it was made in response to strongly worded suggestions that it would be more difficult for the defendant if he did not come forward with information. The interrogators threatened the defendant with these statements : "I can go back and tell the district attorney [you] cooperated with me or I can go back and tell the district attorney that [you] did not cooperate with me;" "it could make a lot of difference to you;" and "there's two ways to go about things, either you go about it and you don't cooperate and the judge knows that you didn't and the district attorney knows you didn't or you turn around and you did cooperate...."

Likewise, in Beavers v. Alaska, 998 P.2d 1040 (Alaska 2000), the Supreme Court of Alaska found a confession was involuntary where the defendant was told during an interrogation that "if you try and hide it from me you're really going to get hammered. I mean ... you gotta come out and tell me the truth on this stuff..." To the same effect is Passama v. Nevada, 103 Nev. 212, 735 P.2d 321 (1987), in which the Nevada Supreme Court found a confession involuntary when the officer told the defendant that the officer would go to the district attorney and see to it that defendant went to prison if the defendant was not entirely truthful.

In United States v. Harrison, 34 F.3d 886 (9th Cir. 1994), the Ninth Circuit reversed a conviction because the defendant's confession was made involuntarily. A federal agent informed the defendant that she might be facing up to 20 years in prison, and he asked her whether she thought it would be better if the judge were told that she had cooperated or had not cooperated. The defendant responded that it would be better if she talked to the agents and they told the judge that she had cooperated. She then made a statement to the agents. Thus, the defendant was not explicitly threatened with a longer sentence if she did not make a statement. Nevertheless, the Court strongly disapproved of the threat of harsher treatment:

> Although it is permissible for an interrogating officer to represent, under some circumstances, that the fact that the defendant cooperates will be communicated to the proper authorities, the same cannot be said of a representation that a defendant's failure to cooperate will be communicated to a prosecutor. Refusal to cooperate is every defendant's right under the fifth amendment. Under our adversary system of criminal justice, a defendant may not be made to suffer for his silence.... We do not ignore the record, but there are *no* circumstances in which law enforcement officers may suggest that a suspect's exercise of the right to remain silent may result in harsher treatment by a court or prosecutor.

Id. at 891-892 [Italics in original].

**Summary and Conclusion**

The Fifth Amendment guarantees the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty from his silence. Malloy v. Hogan, 378 U.S. 1, 8 (1964); Missouri v. Seibert, 124 S.Ct. 2601, 2607 (2004). As explained above, when voluntariness of a defendant's confession is challenged,

the Government must prove voluntariness by a preponderance of the evidence, and voluntariness is evaluated based on the totality of the circumstances. Garcia Abrego, 141 F.3d at 170; Schneckloth, 412 U.S. at 225.

In urging the court to find Defendant's statements voluntary, the Government points out that Defendant was 27 years old at the time of the questioning and is no stranger to the criminal justice system. That may be true. Assuming the truth of the officers' comments in the interrogation, Defendant had been arrested 13 times and had four convictions, but all of them were for *misdemeanors*. Tr. 40. Without more information, those arrests do not support the Government's contention that Defendant "is practiced at denial and deception and was not intimidated by the police." Government's Response to Defendant's Supplemental Memorandum, p. 2. In fact, Defendant's piecemeal admissions in the face of the officers' incessant threats tend to prove the opposite.

When the totality of all of the circumstances are evaluated, the scales tip in favor of finding that Defendant's statements were not made voluntarily. The single most troubling threat made by the officers to Defendant was when Defendant was told "the least amount of talking you do means the most amount of charges I put on you." Tr. 5-6. But that was not the only threat made by the officers to Defendant. Numerous other threats were made throughout the interrogation, all as outlined above. Each of those threats conveyed a simple, yet unmistakable message: cooperate or face harsher consequences. When the totality of the circumstances, including the threats made by the interrogating officers, are considered, the

undersigned finds that Defendant's free will was overcome and that his statements were not voluntary.

Accordingly;

**IT IS RECOMMENDED** that Defendant's Motion to Suppress (Doc. 15) be granted and that all statements made by Defendant during his interrogation be suppressed as involuntarily made.

### **Objections**

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 10 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana on this 16 day of September, 2005.

MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE

cc: Judge Walter